UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JASON J. SCHULTZ,

     Plaintiff,

v.                                              No. 16-CV-12311-DLC

GLENN A. DOHER, et al.,

     Defendants.

## MEMORANDUM & ORDER

CABELL, U.S.M.J.

Pro se plaintiff Jason Schultz contends that prison guards violated his constitutional rights in the course of removing him from his cell.  Pending before the court is the Defendants' Motion to Dismiss and/or For Summary Judgment.  (Dkt. No. 36)  For the following reasons, the motion will be granted in part and denied in part.

### I.   THE PARTIES

The events underlying the lawsuit occurred in 2015 when the plaintiff was incarcerated at the Souza-Baranowski Correctional Center (SBCC) in Shirley, Massachusetts.  Defendant Glenn Doher was at all relevant times a Department of Correction (DOC) officer with the rank of captain.  Defendant James J. Tetreault was a DOC

officer with the rank of Sergeant.   Defendants Eric Phattamachak[1] and Joshua Frates were DOC officers.

## II.   RELEVANT FACTUAL BACKGROUND

As no discovery has yet taken place, and as neither party has submitted a traditional statement of facts, the court begins by describing the major sources of the facts recited below.

The defendants' memorandum "incorporates by reference" affidavits submitted by defendants Doher, Tetreault, Frates, Phattamachak, and a prison investigator named Jamie Brousseau. Defendant Doher's affidavit in turn incorporates several other documents, including separate incident reports written by defendants Tetreault, Frates, Phattamachak, and two other officers who were present but are not named as defendants.   Each of the defendant officers in turn submits an affidavit in which he adopts and authenticates his own incident report.

Defendant Doher also appends the report of two social workers who spoke with the plaintiff prior to his being removed from his cell, the report of a nurse who treated the plaintiff after the removal, various disciplinary reports against Schultz, the inmate grievance form submitted by Schultz, as well as the results of the investigation of that grievance, and a video of the removal incident.   The reports of the nurse and social worker are arguably

---

[1]Officer Phattamachak's name is spelled differently throughout the pleadings; the court uses the spelling that is provided on the docket.

inadmissible hearsay for Rule 56 purposes where neither has submitted an affidavit, but the social worker's interactions with the plaintiff are also captured on the video.

As for the plaintiff, he submits two documents, including (1) a "Plaintiff's Statement of Disputed Factual Issues" and (2) a "Declaration in Opposition to Defendants' Motion for Summary Judgment." Although the statement of disputed issues is "short and concise," it is not "supported by appropriate record citations" as required by Local Rule 56.1(a). However, the plaintiff repeats the principal alleged disputed facts in his Declaration, and that document, while containing some factual assertions not supported in the record, has been verified by the plaintiff pursuant to 28 U.S.C. § 1746. Accordingly, the court will rely on assertions in these documents to the extent they appear to be based on the plaintiff's personal knowledge.

## A. **The Incident**

On April 6, 2015, the plaintiff was speaking to his attorney by telephone when the call "was internally cut-off due to an error with the phone system." (Plaintiff's Declaration In Opposition to Defendant's Motion to Dismiss and/or For Summary Judgment, [Plaintiff's Declaration], ¶ 6). Sergeant Tetreault refused to reconnect the call and the plaintiff in response blocked the window of his cell with his mattress, an act that is prohibited for safety reasons. (Id. at ¶¶ 7-8; Affidavit of James Tetreault [Tetreault

Aff.], ¶ 3).  The parties agree that DOC officers convened outside the plaintiff's cell at approximately 12:50 p.m. to address the situation but offer different versions of what happened thereafter.

### i.  *The Defendants' Version*

According to the defendants, Sergeant Tetreault was informed at approximately 12:50 p.m. that Schultz had covered his cell door window and was asking to speak with a mental health clinician. (Tetreault Aff., at ¶ 3).  Sergeant Tetreault went to Schultz's cell and ordered him to uncover the window.  (Id. at ¶¶ 5-6). Schultz repeatedly cursed at Tetreault and refused to comply, and dared the staff to physically remove him from his cell.[2]  (Id. at ¶¶ 6, 11, 13).  Sergeant Tetreault again asked Schultz to comply with his order, and offered him the opportunity to contact his attorney at a later time.  Schultz refused both offers.  (Id. at ¶¶ 7, 10).  Sergeant Tetreault and two mental health clinicians then spent several minutes in an unsuccessful attempt to persuade the plaintiff to comply and uncover his window.  (Id. at ¶¶ 11-16).  After one last unsuccessful request to Schultz, Sergeant Tetreault at approximately 1:25 p.m. radioed for assistance.  (Id. at ¶ 19).

---

[2] Such statements included: "I'm all set. I'm not uncovering shit"; "It's too late to f**king talk now. I'm not coming out, and bring on the move team"; and "It's too late to talk now. I'm going all the way with this, and bring on the move team."

A "Move Team," which included Officers Tetreault, Frates, Phattamachak and a fourth unidentified officer, donned protective gear and convened outside Schultz's cell.  Based on authorization from Captain Doher, the team prepared to administer a chemical agent into Schultz's cell in order to subdue and remove him.  (Id. at ¶¶ 20-22).  Sergeant Tetreault warned Schultz of the impending use of the chemical agent and, after receiving no response from Schultz, administered the agent through the crack at the top of the door.  (Id. at ¶¶ 22-23).  After issuing another warning, Tetreault administered a second blast.  The blasts proved ineffective because Schultz continued to block the door with his mattress.  (Id. at ¶ 24).

After the second application of the chemical agent, Sergeant Tetreault continued to issue commands to Schultz to come to the door but Schultz did not comply.  (Id. at ¶ 25).  The team opened the cell door, although it was initially difficult to open because objects had been placed in the door track.  (Id. at ¶ 26).  Once opened, the team entered the cell and saw Schultz standing "at the back of the cell in a fighting stance."  Schultz then began to move forward.  (Id. at ¶¶ 27-28; Affidavit of Eric Phattamachak [Phattamachak Aff.] ¶ 4).  The plaintiff charged towards Officer Phattamachak, who protected himself with the shield and guided Schultz to the floor, where he was restrained.  (Id. at ¶ 4).

Schultz was then removed from the cell to be treated by the medical staff.

ii.   *The Plaintiff's Version*

According to Schultz, Sergeant Tetreault ordered him to submit to being removed from his cell but he declined. (Id. at ¶¶ 18-19). Sergeant Tetreault told him that a Move Team was prepared to use a chemical agent in order to subdue the plaintiff if he did not comply. (Id. at ¶¶ 20, 27). Subsequently, Sergeant Tetreault administered an initial burst of the chemical agent through the top of the door and it forced the plaintiff to "the center of cell" "with his back to the door, eyes shut, burning from contact" with the chemical agent. (Id. at ¶ 21). Schultz then removed a mattress from the door, apparently to reposition it to better prevent the agent from hitting him in the face. (Plaintiff's Decl. at ¶ 9). Without warning, though, Sergeant Tetreault administered another burst of the chemical agent which caused the plaintiff to suffer "severe pain in his chest and burning on his exposed skin." (Compl. at ¶¶ 22, 26).

After the second spray, the door to plaintiff's cell was opened and the Move Team entered, consisting of Tetreault, Frates, Phattamachak and others. (Id. at ¶¶ 23, 28). Officer Phattamachak's poly-captor shield struck the plaintiff "with enough force to knock [him] airborne" into a metal desk in his cell. (Id. at ¶ 29). Schultz went to the ground and Officer

Frates "smashed" the plaintiff's face onto the floor four times, and struck him five times with closed fist punches to the side of his head. (Id. at ¶ 31). Schultz maintains that he never physically resisted during the incident. (Id. at ¶¶ 17, 30). Schultz was ultimately placed in leg and hand restraints and transported to the Trauma Room in the prison's infirmary for a medical evaluation. Id. at ¶ 33.

Complementing the parties' respective accounts, a camera filmed events outside the cell but did not record any sound. Consistent with the parties' narratives, the film shows an officer emitting a short burst of a chemical agent into the cell and, after an interval of several seconds, emitting a second short burst. Five officers dressed in protective gear then enter the cell while a sixth officer in regular uniform stands outside, and eventually walks away. One of the five officers who entered emerges briefly after a minute and then reenters the cell several seconds later. After an overall total of approximately 90 seconds inside the cell, the officers and Schultz walk out of the cell. Schultz is in full hand and leg restraints and is noticeably bleeding from an unseen head wound. Blood extends from his forehead to his lip, and his right eye appears to be red and puffy

Following the incident, Dr. Somers assessed Schultz and noted an abrasion 1.5 centimeters in diameter on Schultz's temple and a superficial laceration approximately 1 centimeter in length above

the other temple.  (Affidavit of Glenn Doher [Doher Aff.] ¶ 11).
Both areas were cleaned and Dr. Somers applied steri-strips to the
lacerations.  (Id.)  Schultz did not mention any other medical
related complaints.  (Id.).  Schultz also refused a shower after
being medically cleared to return to his cell.  Once there, his
restraints were removed and he was secured in his cell.  (Id. at
¶¶ 30-31).  Schultz later apologized to the staff for his actions
and stated that "he was just having a bad day."  (Id. at ¶ 32).

## B. **The Grievance**

Schultz filed an internal grievance the following day. He
claimed that he was "viciously beaten by unknown officers" and he
requested an investigation.  (Dkt. No. 43-4, Ex. D: Inmate
Grievance Form).  On April 17, 2015, staff from DOC's Internal
Affairs section interviewed the plaintiff again but he had nothing
new to add.

On April 29, 2015, a prison investigator reported that he was
extending the length of time of Schultz's grievance by ten days
"to further research the matter."  Id., at pg. 5.

The investigation apparently continued longer than that.  On
September 23, 2015, another prison investigator named Jamie
Brousseau attempted to interview the plaintiff concerning his
allegations of maltreatment.  (Affidavit of Jamie Brousseau
[Brousseau Aff.] ¶ 2).  According to Brousseau, when Schultz was
asked to describe what happened that day, he replied "I don't want

to speak on this incident."  When asked why he refused to comment he said "just don't want to speak on it."  When asked if he would answer any questions he said no, that he would not.  Brousseau then ended the interview.  (Id. ¶¶ 4-6).

On September 25, 2015, the investigation resulted in a finding that the plaintiff's use of force allegation was unfounded.  The finding was based in large part on the fact that "Schultz did not identify any specific officer as using excessive force and when interviewed to find out more detail, Schultz refused to comment." (Dkt. No. 43-5, Exhibit E: Investigation Report, pg. 12).

### III. THE COMPLAINT

The complaint asserts three violations of Schultz's constitutional rights pursuant to 42 U.S.C. § 1983.  Paraphrasing, Count I alleges that officers Tetreault, Phattamachak, and Frates used excessive physical force and a dangerous chemical agent in removing the plaintiff from his cell, in violation of his Eighth Amendment right to be free from cruel and unusual punishment. Count II alleges that Sergeant Tetreault failed to determine that the plaintiff was "hyper sensitive" to "chemical agents" and thus was deliberately indifferent to the plaintiff's serious medical needs.  Finally, Count III alleges a general claim against Captain Doher for his involvement in the underlying incident.

IV.   **LEGAL STANDARD**

Where a party on a motion to dismiss for failure to state a claim presents matters outside the pleadings, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 after the parties have been given a "reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed. R. Civ. P. 12(b).  In that regard, the plaintiff has not complained in opposing the defendants' motion that he has not been given a reasonable opportunity to present any desired evidence to the court.

When the court is presented with a motion for summary judgment, it shall grant it "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of "assert[ing] the absence of a genuine issue of material fact and then support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Gold Co.*, 335 F.3d 15, 19 (1st Cir. 2003).  Once the moving party meets that burden, in order to avoid summary judgment, the opposing party must "show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation." *Fontanez-Nunez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006)(*quoting Ingram v.*

*Brink's Inc.*, 414 F.3d 222, 228-29 (1st Cir. 2005)).  Indeed, the opposing party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trail worthy issue." *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006)(*quoting Triangle Trading Co. v. Robroy Indus. Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)).

When determining whether summary judgment is appropriate, "a court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Id.*(*citing Nocolo v. Philip Morris, Inc.*, 201 F.3d 29, 33 (1st Cir. 2000)).  The Federal Rules require "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986)(*citing* Fed R. Civ. P. 56)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007)(*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986))(internal quotation marks omitted).

## V.   ANALYSIS

### A. Failure to Exhaust Administrative Remedies

The defendants argue as a threshold matter that Schultz has failed to exhaust his administrative remedies.  They argue that because his grievance did not mention the use of a chemical agent, he has not exhausted his remedies with respect to any claim implicating its use.  They argue also that Schultz failed to provide "a complete statement of facts relevant to the grievance" and that this failure coupled with his subsequent refusal to fully cooperate with the investigator should be treated as a failure to follow the process through to resolution.

Under the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a), "[n]o action shall be brought with respect to prison conditions under 42 U.S.C. § 1983...or any other Federal law, by a prisoner...until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  This limitation on the ability of prisoners to sue "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, (2002).

The DOC's grievance policy requires "a brief statement of facts." 103 C.M.R. 491.09(2)(d).  It states that "inmates may process their grievance by obtaining an institution grievance form." 103 C.M.R. 491.09(1).  The grievance must be filed within

ten working days of the actual incident.  103 C.M.R. 491.08(4).
The Institutional Grievance Coordinator must "interview the inmate
and, if appropriate, the staff person responsible for the area
where the problem occurred."  103 C.M.R. 491.10(1)(c).

The primary purpose of a grievance system is to alert prison
officials of problems, not to act as notice that a particular
prison official may be sued.  *Mallory v. Marshall*, 659 F. Supp. 2d
231, 238 (D. Mass. 2009).  Massachusetts regulations also do not
require that inmates list causes of action in a grievance.  See
*Faust v. Cabral*, 2013 WL 3933021, at *3 (D. Mass. July 30, 2013).
Thus, in order to determine whether an agency received sufficient
notice "to investigate and consider all grounds" for the prisoner's
complaint, the Court looks to see whether the "claims in the
complaint are 'like or reasonably related' to the allegations in
the grievance."

Accepting that Schultz could have been more complete in
articulating the nature of his grievance, and more solicitous and
verbose in conveying details underlying the grievance to the
investigators, the court cannot find that he failed to exhaust his
administrative remedies.  The relevant inquiry in determining
whether a grievant's administrative claims were adequate is
whether they were "like or reasonably related" to the claims
brought in the present action, which turns on a consideration of
"whether a reasonable investigation of the administrative claim

13

would have uncovered the allegations of the civil rights complaint." *See Carter v. Symmes*, No. 06-10273-PBS, 2008 U.S. Dist. LEXIS 7680, at * 10 (February 4, 2008)(*citing Villegas v. Robinson*, No. CIVSO22225FCDPANP, 2005 WL 1683934, at *2 (E.D. Cal. July 12, 2005). Courts have liberally applied the "like or reasonably related" exception in PLRA failure to exhaust claims. *Compare Garcia v. Mule Creek State Prison*, No. S 03-1947 MCEPANP, 2005 WL 1366515, at *2 (E.D. Cal. May 31, 2005) (holding that a prisoner's grievance alleging a discrete instance of deficient medical care was sufficient to cover all claims arising from his ongoing course of treatment because the claims were factually similar, and thus reasonably related, despite the temporally vague nature of the prisoner's later-alleged claims), *with Sheptin v. United States*, No 99 C 8459, 2000 WL 1788512, at *3 (N.D. Ill. Dec 5, 2000) (finding the reasonably related exception inapplicable where the original grievance alleged inadequate medical care and plaintiff-prisoner later sought to add factually different claims for, among other things, harassment by prison employees, filing of a false incident report, and failure to comply with a subpoena).

Here, Schultz submitted an administrative complaint alleging that officers had beaten him in the course of removing him from his cell. Even though Schultz failed to identify the officers involved or to reference the use of a chemical agent, the officers wrote incident reports summarizing the incident and noted

14

explicitly that a chemical agent was used.  Presuming that the prison's investigation of Schultz's complaint necessarily included a review of the officers' incident reports, it follows that the excessive force investigation incorporated the fact that officers who were identified used a chemical agent.  Consequently, the court finds no basis to conclude that the plaintiff meaningfully failed to exhaust administrative remedies.

### B. Excessive Force Claim

Turning then to the plaintiff's specific claims, the defendants argue that they are entitled to judgement on the plaintiff's excessive force claim because the use of force was *de minimis* and was for a "justifiable penological purpose…with all contact being incidental to the restraint and extraction of Schultz from his cell in as efficient a manner as possible."  The defendants argue that a physical confrontation occurred only because Schultz refused their entreaties that he comply, and that his injuries were inadvertent and occurred as an "unintended and unforeseen consequence" of Schultz's recalcitrance.  As noted above, though, Schultz contends that although he declined to leave his cell when asked, that he was standing with his back to the door when they entered, and that he did not resist the officers' advances.  He contends that Officer Phattamachak nonetheless hit him with his shield with enough force to knock him airborne into a metal desk causing a head wound.  He also alleges that Frates

15

smashed Schultz's face into the concrete floor, and that Sergeant Tetreault used excessive force when he sprayed a chemical agent into Schulz's cell.

Where an excessive force claim arises in the context of an inmate's interactions with correction officers, it is most properly characterized as one invoking the protections of the "cruel and unusual punishment" clause of the Eighth Amendment. *See Framer v. Brennan*, 511 U.S. 825, 832 (1994); *Maraj v. Massachusetts*, 836 F. Supp. 2d 17, 26 (D. Mass. 2011). The relevant inquiry when such a claim is made is whether "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Orwat v. Maloney*, 360 F. Supp. 2d 146, 153 (D. Mass. 2005)(*quoting Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992)). "Factors such as the need for application of force, the relationship between the need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response are relevant in determining whether a prison official used excessive force." *Perry v. Dickhaut*, 125 F. Supp. 3d 285, 296 (D. Mass. 2015)(*quoting Hudson*, 503 U.S. at 7).

Applied here, there is a dispute of material fact as to whether the defendants used force in a good faith effort to effect the plaintiff's compliance or to maliciously and sadistically cause him harm. Although the court agrees that the defendants

would be entitled to judgment if the facts are as they allege them, a reasonable juror crediting the plaintiff's version of events could conclude that the officers applied more force than was necessary to bring about his removal, and that "such use of [force] on a defenseless and non-resistant inmate was non de minimis force applied maliciously and sadistically for the very purpose of causing harm, rather than in a good-faith effort to maintain or restore discipline."   Summary judgment is therefore not appropriate on this claim.   *See Perry*, 125 F. Supp. 3d at 297(finding excessive force where the plaintiff was not resisting forced entry or being placed in restraints)(internal citations omitted).

The defendants argue that they should be entitled to qualified immunity even assuming they did use excessive force.   Qualified immunity serves as a shield to government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   It does not, however, shield public officials who, from an objective standpoint, should have known that their conduct was unlawful.   *Haley v. City of Boston*, 657 F.3d 39, 47 (1st Cir. 2011).   Courts use a two-part test to determine whether qualified immunity applies: (1) whether the facts alleged by the plaintiff make out a violation of a

constitutional right; and if so (2) whether the right was clearly established at the time of the alleged violation. *MacDonald v. Town of Eastham*, 745 F.3d 8, 11 (1st Cir. 2014).

Here, and as noted above, there is a genuine dispute of material fact as to whether defendants Frates, Phattamachak, and Tetreault used excessive force in subduing and removing the plaintiff from his cell. Assuming a jury were to conclude that they did, the law was clearly established at the time of the incident that a prison official cannot use excessive force on an inmate for the sole purpose of causing harm. *See Perry*, 125 F. Supp. 3d at 298 ("It was clearly established in 2010 that a prison official may not inflict unnecessary and wanton pain and suffering by using force against an inmate maliciously and sadistically for the very purpose of causing harm."); *Nascarella v. Cousins*, No. 13-cv-10878-IT, 2015 WL 1431054, at *6 (D. Mass. Mar. 27, 2015)("Eighth Amendment precedent predating July 3, 2012, clearly prohibits the unjustified use of force against prisoners."). It follows that the defendants are thus not entitled to qualified immunity here.

### C. Medical Indifference Claim

The plaintiff alleges in Count II that Sergeant Tetreault was deliberately indifferent to his medical needs because the officers knew he had asthma but nonetheless used a chemical agent as part of the plan to effect his removal. In order to prove an Eighth

Amendment violation based on deliberate indifference, a prisoner must show that the official: (1) engaged in "objectively, sufficiently serious" conduct; and (2) acted with "deliberate indifference" to an inmate's health or safety. *Calderon-Ortiz v. LaBoy-Alvarado*, 300 F.3d 60, 64 (1st Cir. 2002)(citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

The court finds that the plaintiff cannot prove deliberate indifference on this record. Even assuming *arguendo* that the use of a chemical agent on an inmate with asthma could constitute objectively serious conduct, there is no evidence that Sergeant Tetreault acted with deliberate indifference to the plaintiff's safety here. On the contrary, the record supports a finding that Sergeant Tetreault and others were demonstrably not indifferent to the plaintiff's safety. They implored the plaintiff to exit his cell and unambiguously warned him that they would have to use an agent if he refused. Moreover, when the plaintiff did refuse and an agent was used, the video makes plain that it was used briefly and sparingly. Further, while not dispositive, it is notable that the plaintiff did not appear to be in any distress when he emerged from the cell, did not seek medical treatment for irritation from the agent, and did not complain about the use of a chemical agent when he submitted his grievance. Indeed, the plaintiff does not meaningfully address this portion of the defendants' motion in his

opposition.   Summary judgment will therefore enter in Sergeant Tetreault's favor on this claim.

   **D. Supervisory Liability Claim**

   Count III alleges a claim against Captain Doher but the court cannot readily discern its specific nature or scope.  The complaint alleges (1) that Captain Doher authorized the use of a chemical agent, (2) that he "was in a position to prevent" [the officers] from maliciously and sadistically inflicting harm" on the plaintiff but failed to intervene or report it, (3) that he "has routinely overlooked" incidents of excessive force on other prisoners, and (4) that he has been the shift commander in at least one other incident where the plaintiff also alleged excessive force.

   It is not clear whether the plaintiff intends for each of these assertions to be read separately, that is, to allege four separate claims against Captain Doher, or alternatively to be read together to assert one specific claim.  If it is the former, the claims are too conclusory and vague to state a viable claim for relief.  If it is the latter, it remains unclear whether the plaintiff is alleging a failure to supervise or a failure to train, or asserting a claim of excessive force or deliberate indifference. The court therefore will dismiss count III for failure to state a viable claim, but without prejudice, subject to the plaintiff's ability to amend to set out a short and plain statement of the

claim showing that the plaintiff is entitled to relief.  Fed. R. Civ. P. 8(a)(2); *see McDonald v. Hall*, 610 F.2d 16 (1st Cir. 1979)(the court is not required to "conjure up unpled allegations," notwithstanding the duty to be less stringent with pro se complaints); *Chandler v. Greater Boston Legal Servs.*, No. 13-12979-GAO, 2013 U.S. Dist. LEXIS 173919, at *9 (December 10, 2013)(*citing Terrance v. Cuyahoga County*, No. 1:05CV1926, 2005 U.S. Dist. LEXIS 48466, at *1 (N.D. Ohio 2005)(finding that requiring "[the courts] to explore exhaustively all potential claims of a pro se plaintiff, ... would ... transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party.").

## VI.   CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment (Dkt. No. 36) will be GRANTED IN PART and DENIED IN PART. Specifically, summary judgment is DENIED on Count I and GRANTED on Count II.  Count III is DISMISSED, without prejudice, with 30 days for leave to file an amended complaint that addresses the issues noted here by the court.

### *SO ORDERED.*

/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED:  September 27, 2018

21